Merrimack
No. 91-466

AMERICAN AUTOMOBILE ASSOCIATION

v.

THE STATE OF NEW HAMPSHIRE & a.

December 31, 1992

*Wiggin & Nourie P.A.*, of Manchester (*T. William Bigelow & a.* on the brief, and *Thomas J. Pappas* orally), for the plaintiff.

*John P. Arnold*, attorney general (*Stephen J. Judge*, senior assistant attorney general, on the brief and orally), for the State.

HORTON, J. The plaintiff, the American Automobile Association, appeals a decision by the Superior Court (*Flynn*, J.), upholding the constitutionality of an amendment to RSA 261:20 (Supp. 1992), increasing motor vehicle certificate of title fees, and allocating fifty percent of those fees to the State's general fund. The plaintiff claims that the amended statute violates part II, article 6-a of the New Hampshire Constitution, which restricts the use of revenue generated from the operation of motor vehicles to highway purposes. The plaintiff further claims that the amendment violates part II, article 5, which requires that all taxes, assessments, and rates be "proportional and reasonable." We reject the plaintiff's claims and affirm.

The New Hampshire Legislature adopted the Uniform Motor Vehicle Certificate of Title and Anti-Theft Act in 1967 to establish a system for issuing certificates of title to automobiles registered in the State. *See* Laws 1967, 357:1. According to its sponsor, the Act was intended to prevent fraud in the sale or transfer of motor vehicles, and to keep New Hampshire from becoming a "dumping ground or way station" for cars stolen in other States. Transcript of Appropriations Committee Hearing on House Bill 674, June 22, 1967. Under the Act, which is now codified as RSA chapter 261, most motor vehicles, to be registered in this State, must have a certificate of title, issued and in force, detailing the date of the certificate's issuance, the name and address of the owner and any lienholders, the vehicle's title number, and a description of the vehicle. *See* RSA 261:2, :8 (1982 & Supp. 1992).

In 1990, the legislature amended the statute to increase the fee for obtaining a certificate of title from $10 to $20. *See* RSA 261:20, I(a)–(f) (Supp. 1992). The amended statute provides that fifty percent of the title fees "shall be deposited as unrestricted revenue in the general fund and [fifty] percent shall be deposited in the highway fund." RSA 261:20, IV (Supp. 1992). The plaintiff brought an action challenging the constitutionality of the 1990 amendment. It claimed that the amended statute violates part II, article 5 of the New Hampshire Constitution, which requires that State assessments and taxes be "proportional and reasonable." The plaintiff further claimed that by allocating title fees to the State general fund, the amended statute violates part II, article 6-a, which provides as follows:

[Use of Certain Revenues Restricted to Highways.] All revenue in excess of the necessary cost of collection and administration accruing to the state from registration fees, operators' licenses, gasoline road tolls or any other special charges or taxes with respect to the *operation* of motor vehicles . . . shall be appropriated and used exclusively for the construction, reconstruction and maintenance of public highways within this state, including the supervision of traffic thereon and payment of the interest and principal of obligations incurred for said purposes; and no part of such revenues shall, by transfer of funds or otherwise, be diverted to any other purpose whatsoever.

(Emphasis added.)

The trial court upheld the constitutionality of the 1990 amendment to RSA chapter 261. It first found that certificate of title fees repre-

sent charges relating to "the operation of motor vehicles," and thus are subject to the restrictions of part II, article 6-a. As such, the State could use these fees only for the highway purposes enumerated in the article. The trial court further found that the certificate of title program set forth in RSA chapter 261 encompasses not only the issuance of titles, but also general efforts to prevent and detect motor vehicle theft. This program, the trial court concluded, constitutes a legitimate highway purpose within the meaning of part II, article 6-a. Finally, the trial court found the certificate of title fees "proportional and reasonable" under part II, article 5. It found, based on stipulated basic facts, that in fiscal year 1990, title fees collected pursuant to the amended statute totaled $3,537,021, whereas the costs incident to processing the titles totaled only $1,222,723. During the same period, however, the State's expenditures on all anti-theft activities, including the $1,222,723 in processing costs, totaled $5,067,824, well above the amount generated by the title fees.

Both the plaintiff and the State have appealed the trial court's decision. The plaintiff claims that the amended statute violates part II, article 6-a, by diverting certificate of title fees to the State general fund, where their use is not restricted to highway purposes. In addition, the plaintiff claims that the State's anti-theft activities do not constitute a highway purpose within the meaning of part II, article 6-a. Finally, the plaintiff argues that the amended statute generates revenue far exceeding the cost of implementing the certificate of title program, in violation of part II, article 5. For its part, the State claims that the trial court erred in holding that title fees constitute revenue from the "operation of motor vehicles." According to the State, the fees are assessed incident to a vehicle's ownership, not operation, and thus are not restricted by part II, article 6-a.

■ The threshold issue is whether the certificate of title fees represent charges with respect to the operation of motor vehicles, and therefore implicate the restrictions in part II, article 6-a. We agree with the State that the fees are incurred as a result of the ownership rather than the operation of motor vehicles and, thus, fall outside the ambit of part II, article 6-a.

The plain meaning of RSA chapter 261, which addresses not only the certificate of title program, but also the registration of motor vehicles, supports our view. The statute's certificate of title provisions, RSA 261:1 to :39 (1982 & Supp. 1992), take effect only upon the sale of a vehicle and the resultant change in its registration. *See* RSA 261:1 (Supp. 1992). Title fees, therefore, are assessed incident to a

transfer of a vehicle's ownership, not its operation. In contrast, the statute requires the registration of all motor vehicles prior to their operation on State roads. *See* RSA 261:40. Fees to register motor vehicles, therefore, relate directly to the operation of vehicles and are specifically identified as such in part II, article 6-a.

The plaintiff argues that *Opinion of the Justices*, 117 N.H. 655, 377 A.2d 137 (1977), mandates a finding that certificate of title fees constitute article 6-a fees. In that opinion, the justices considered the constitutionality of a bill that would have allocated fees from both motor vehicle inspection stickers and certificates of title to a highway transportation fund to assist the elderly and handicapped. *Id.* at 658, 377 A.2d at 139. They opined that the proposed legislation violated part II, article 6-a because the fees would not have been used for highway purposes. *Id.* The opinion, however, hinged on the appropriate use of article 6-a fees, and did not consider the specific issue of whether the inspection fees or certificate of title fees constituted article 6-a fees.

Since we conclude that certificate of title fees are not restricted by part II, article 6-a, we need not address the plaintiff's contingent argument that these fees must be used exclusively for the highway purposes set forth in article 6-a.

The plaintiff also argues that the amended statute represents a general revenue-raising measure that implicates part II, article 5. According to the plaintiff, because the amended statute generates more revenue than necessary to administer the certificate of title program, it violates the reasonable and proportional requirement of article 5.

■ The parties and the trial court assumed without discussion that certificate of title fees are licensing fees subject to part II, article 5. Licensing fees, however, are not synonymous with taxes or assessments and are not measured by the article 5 standard. Before addressing the substance of the plaintiff's claim, we must determine whether title fees represent taxes implicating part II, article 5, or licensing fees that do not fall within this article unless so intended by the legislature.

■ A "tax is an enforced contribution to raise revenue and not to reimburse the state for special services." *Opinion of the Justices*, 117 N.H. 749, 756, 379 A.2d 782, 786 (1977). Under part II, article 5, taxes must be proportional and reasonable, "that is, equal in valuation and uniform in rate, and just." *Id.* at 755, 379 A.2d at 786 (citation omitted). By comparison, licensing fees are charges that "bear a

relation to and approximate the expense of issuing the licenses and of inspecting and regulating the business licensed." *Laconia v. Gordon*, 107 N.H. 209, 211, 219 A.2d 701, 703 (1966). They must be incidental to the implementation of a regulatory program and cannot primarily be intended to produce additional revenues. *See id.* The validity of such fees is measured "principally by the necessary expenses of issuing the license, and of such inspection, regulation and supervision as may be necessary." *Opinion of the Justices*, 112 N.H. 166, 170, 290 A.2d 869, 872 (1972). The amount of a fee will be sustained so long as it is not "grossly disproportionate" to the regulatory expenses. *Hooksett Drive-In Theatre, Inc. v. Hooksett*, 110 N.H. 287, 289, 266 A.2d 124, 126 (1970). A licensing fee, however, may cover incidental expenses incurred "in consequence of the activity regulated provided the resulting fee does not become unreasonable." *Opinion of the Justices*, 112 N.H. at 170, 290 A.2d at 872. In addition, that licensing fees "produce some surplus revenue does not render" the licensing act unreasonable or invalid. *Id.; see also Laconia*, 107 N.H. at 211, 219 A.2d at 703.

The distinction between a tax and a license fee "is often difficult to determine because each partakes to some extent of the characteristics of the other." *Opinion of the Justices*, 98 N.H. 527, 528, 96 A.2d 733, 733 (1953). The authority to license an activity "cannot be exercised as a means of taxation, with a view to revenue, unless such appears to have been the legislative intent." *State v. Angelo*, 71 N.H. 224, 228–29, 51 A. 905, 908 (1902). If revenues generated by a licensing act "clearly and materially exceed the direct and incidental costs of licensing," the excess revenue "becomes a tax subject to all the constitutional requirements of taxation." *Opinion of the Justices*, 112 N.H. at 170–71, 290 A.2d at 872. Nonetheless, we will not characterize a license fee as a tax simply because it "is large, or because it may become a part of the public revenue." *Opinion of the Justices*, 116 N.H. 351, 356, 358 A.2d 667, 671 (1976) (quotation omitted). To determine the proper characterization of a statute, "it is necessary to discover its basic purpose." *Opinion of the Justices*, 98 N.H. at 528, 96 A.2d at 733; *see also Coltin Company v. Manchester Savings Bank*, 105 N.H. 254, 256, 197 A.2d 208, 210 (1964) (the "touchstone" as to whether a licensing statute is a revenue measure or a police power regulation is the intent of the legislature). In so doing, we must consider the statute's declared purpose as well as its "essential characteristics." *Opinion of the Justices*, 98 N.H. at 528, 96 A.2d at 734.

We do not agree that RSA 261:20 (Supp. 1992) is primarily a revenue-raising measure implicating part II, article 5. Rather, we find that certificate of title fees assessed pursuant to the statute constitute licensing fees which allow the lawful ownership and transfer of motor vehicles. A "basic purpose" of the Uniform Motor Vehicle Certificate of Title and Anti-Theft Act—as its title suggests—is not to raise revenue, but to establish a system to prevent and detect motor vehicle theft. *See Dartmouth Motor Sales, Inc. v. Wilcox*, 128 N.H. 526, 530, 517 A.2d 804, 807 (1986) ("intent of [RSA chapter 261] is 'to facilitate the identification of motor vehicles, the ascertainment of their owners and the prevention of theft or fraud in their transfer'") (quoting *In re Circus Time, Inc.*, 641 F.2d 39, 44 (1st Cir. 1981)). In addition, the statute's essential characteristic is its program to deter auto theft by preventing the fraudulent transfer of stolen vehicles. A central aspect of the program is the issuance of a certificate of title prior to the sale or transfer of a vehicle. A title has no independent intrinsic value, and is significant only when viewed in conjunction with the statute's broader anti-theft provisions. Legislation increasing by $10 the cost of a title does not fundamentally change the statute's essential characteristics. Nor do we discern a legislative intent to provide for more than the cost of administration, regulation and enforcement under the statute. We thus conclude that funds generated under RSA chapter 261 should not be characterized and reviewed as a tax under part II, article 5, but as a licensing fee. This fee will be upheld so long as it is not "grossly disproportionate" to the State's regulatory expenses. *Hooksett*, 110 N.H. at 289, 266 A.2d at 126.

Although purporting to evaluate the title fees as taxes under part II, article 5, the trial court in effect treated the fees as licensing fees and focused its analysis on whether the fees were proportional to the State's regulatory expenses. This focus is manifest in the trial court's recognition that permissible license fees "are those which do not exceed the probable expense of issuing licenses and regulating business." (Quotation omitted.) In evaluating the title fees, the trial court used data from fiscal year 1990 in conjunction with facts stipulated by the parties. In fiscal year 1990, the amended statute generated title fees totaling $3,537,021. The State spent only $1,222,723 to process the titles. The trial court found, however, that during this same period, the State spent $5,067,824, including the $1,222,723 title processing costs, on a range of anti-theft activities and programs. These costs included $70,000 on the State Anti-theft Unit, which investigates stolen car reports; $685,101 on the National Crime Infor-

mation Computer; $90,000 on the processing of certain motor vehicle offenses in the State district courts; and $3,000,000 on local anti-theft enforcement efforts, made material through revenue-sharing programs.

The plaintiff challenges the trial court's conclusion that the $3,000,000 spent in fiscal year 1990 on local anti-theft efforts could have originated as certificate of title fees. To calculate this expenditure, the trial court started with $77,262,135, representing the total of all local police department budgets in 1988, the most recent year for which such statistics had been prepared. Four percent of the offenses investigated by local police departments in 1988 pertained to motor vehicle theft. Multiplying $77,262,135 by four percent, the trial court concluded that the State spent approximately $3,000,000 in revenue-sharing funds on anti-theft activities in fiscal year 1990. (The trial court declined to revise the 1988 budget estimates to account for inflation.) The plaintiff charges that this calculation is flawed because the State distributed only $51,400,000 in total revenue-sharing funds in fiscal year 1990. Local police departments received only ten percent of these funds, or $5,140,000. Thus, the plaintiff claims that the amount of revenue-sharing funds spent on anti-theft activities in fiscal year 1990 was four percent of $5,140,000, or approximately $205,000.

 We have required "definite information" as to the relationship between the amount of money generated by a licensing statute and the costs associated with licensing and regulating the activity in question. *Opinion of the Justices*, 112 N.H. at 171, 290 A.2d at 873. Our analysis in the present case must focus on the amount of title fees earned and the total cost of the State's anti-theft activities. We agree that the trial court should have included in its calculation only the amount of State funds that actually went to local governments, or $51,400,000, not the total budget of all local police departments, or $77,262,133. It is irrelevant, however, that only ten percent of the revenue sharing funds went to local police budgets. As the trial court recognized, dollars are fungible, and we can assume, for the purpose of evaluating the reasonableness of the certificate of title fees, that local governments allocated all of their revenue-sharing funds to the police departments. Four percent of $51,400,000 is $2,056,000, or $944,000 less than the sum calculated by the trial court. After reducing the State's total anti-theft expenditures by $944,000, the end result, $4,123,824, is still substantially greater than the $3,537,021 in title fees collected in fiscal year 1990. We agree with

the trial court that these programs and activities are incidental to the certificate of title program, and that the title fees are reasonable to fund these efforts.

We find that the amendment to RSA 261:20 (Supp. 1992) was properly enacted as a license fee, is reasonable in amount, and is not disproportionate to the expenses of administration, regulation and enforcement. In addition, the allocation of certificate of title fees to the general fund is appropriate and not violative of part II, article 6-a.

*Affirmed.*

All concurred.